**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF MASSACHUSETTS**

**EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>JOHN WILLIAM CRANNEY and<br>NEVENA NICHOLE CRANNEY,<br><br>Debtors | Chapter 11<br>Case No. 13-11220-FJB |

**MEMORANDUM OF DECISION AND ORDER ON
MOTION OF UNITED STATES TRUSTEE TO CONVERT CHAPTER 11 CASE TO CHAPTER 7**

The United States Trustee for Region I, William Harrington (the "UST"), has moved under 11 U.S.C. § 1112(b) to convert the joint chapter 11 case of debtors John ("Jack") and Nevena Cranney ("the Debtors") for cause. The UST relies on six separate causes, including especially (i) that the debtors are realizing substantial or continuing losses to or diminution of their estate and there is no reasonable likelihood of rehabilitation, § 1112(b)(4)(A), and (ii) that debtor Jack Cranney committed fraud prior to the petition date by borrowing some $10,400,000 from individual lenders for which he cannot account, in what amounts to a Ponzi scheme. The Debtors deny the allegation of fraud, maintain that a plan can be confirmed in a reasonable time, and contend that the interests of creditors are better served by confirmation of a chapter 11 plan than by liquidation in chapter 7. As their plan, the Debtors propose to operate two independent distributorships of Shaklee Corporation products and, from the proceeds, pay first their living expenses and then dividends to their creditors. They have offered virtually no other details of a proposed plan. After an evidentiary hearing on the motion, the Court now enters the following findings of fact and conclusions of law.

1

**Backgrounds Facts**

The Debtors own one of the two Shaklee distributorships themselves; this distributorship generates approximately 41 percent of the combined gross income of these distributorships. The other is presently in the name of a corporation, known as Belmont Industries ("Belmont"), that is wholly owned by Jack, but control of the Belmont distributorship is in dispute: Jack's son, David Cranney, and David's wife, Mandy, contend that they have the right to control that interest. It is undisputed that Jack Cranney has been tremendously successful as a Shaklee distributor and trainer. It is also undisputed that Jack Cranney obtained loans from some 36 individuals, mostly other Shaklee distributors, to two wholly-owned entities, Cranney Capital I and Cranney Capital III, which loans were made as investments by the lenders and totaled $10,400,000. The Secretary of the Commonwealth of Massachusetts (SOC) has filed an administrative complaint against Jack Cranney in which the SOC alleges that the obtaining of these loans was a Ponzi scheme. Jack Cranney lists most of these lenders as creditors in this case but disputes their claims (at least against him—their claims against the Cranney Capital entities are not in issue). In the summer of 2012, and on account of the SOC's allegations, Shaklee Corporation suspended the Debtors' rights to act as Shaklee distributors, and pursuant to injunctions entered in litigation by alleged Ponzi scheme victims, Shaklee has been enjoined, at least temporarily, from paying to the Debtors or Belmont the receivables their distributorships have earned. The complaint of the SOC has not yet been adjudicated, but at least two Ponzi claimants have already obtained judgments against him for their loans to the Cranney Capital entities. Not all of these alleged Ponzi victims view themselves as having been wronged. At Jack Cranney's request, eight of them testified at the hearing in favor of allowing the Debtors to continue in chapter 11 on the theory that they have more hope of recovery through a chapter 11 plan than through a chapter 7 liquidation; each expressed confidence in the good faith and extraordinary business skills of Jack Cranney, but none had knowledge of the relevant bankruptcy law, of the facts on which the confirmability of a plan would depend, or of the extent of

assets that might be generated for creditors in chapter 7. Nor could any explain the use to which Jack Cranney had put the monies they had loaned to the Cranney Capital entities.

The Debtors' principal assets are their home, their own Shaklee distributorship, both of which they own jointly, and Jack's interest in Belmont Industries. They value the home at $3 million, but it is subject to undisputed mortgages totaling $1.9 million; the Debtors have claimed a homestead exemption in it totaling $1.25 million, which is likely to be challenged; and the home is subject to judicial liens totaling at least $380,000. It is unclear but doubtful that there will be equity in the home for the estate. The Debtors' value their own Shaklee distributorship at $1.2 million and Jack's interest in Belmont at $1.5, but they adduced no basis for these valuations at the evidentiary hearing, and the value of these assets to the estate—either as going concerns generating revenue or upon sale—is at best highly speculative. It is unclear whether they can be sold for the benefit of creditors over the objection of Shaklee or whether Shaklee would object to such a sale.

**Applicable Law**

Section 1112(b)(1) of the Bankruptcy Code states: "Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." Subsection (c) does not apply here. Subsection 1112(b)(4)(A) specifies that, for purposes of subsection 1112(b), "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," the first cause on which the UST relies. The burden of proving cause is on the party moving to convert, and cause must be shown by a preponderance of the evidence. Subsection 1112(b)(2) states that notwithstanding the establishment of cause, the Court, in certain circumstances, "may not" covert the case to one under chapter 7, but that

3

exception requires an affirmative showing by the debtor that (among other things) "there is a reasonable likelihood that a plan will be confirmed."

The second cause on which the UST relies, that debtor Jack Cranney perpetrated a $10.4 million Ponzi scheme, would be cause to appoint a chapter 11 trustee.  It might also constitute cause for conversion to chapter 7 because, if true, it would put in substantial doubt his credibility and good faith and therefore his ability to confirm a plan of his own proposal.  But the Ponzi allegation, if proven, would not necessarily constitute cause for conversion.  It would not necessarily establish that a plan could not be fashioned, to which the debtors would be proponents but not the sole proponents, that would generate a greater return by operation of the Shaklee distributorships than by liquidation in chapter 7.

**Discussion**

As a preliminary matter, I note that the situations of the two debtors are not identical.  Nevena Cranney is not alleged to have had a role in her husband's alleged Ponzi scheme; and, because of a stroke she suffered some years ago, she has not been active in the distributorship business over the last few years and would not be active in the business that her husband contends would generate the income to fund their plan of reorganization.  Also, the filing of a joint case does not, by itself, create a single consolidated estate but separate estates of each debtor.  11 U.S.C. § 302(b).  These differences, however, are of little practical consequence for the present motion.  Insofar as the Debtors have articulated the outlines of a plan, it is a single joint plan, and it would be driven largely by Jack's business skills and energies.  The Debtors' significant assets are all owned either by Jack alone or by the Debtors jointly.  Therefore, if Jack's actions have tainted or compromised their rights to the Shaklee distributorships—the centerpieces of their proposed reorganization—then *all* their Shaklee rights are affected.

The UST has shown a substantial or continuing loss to or diminution of the bankruptcy estate. The debtors presently have no income other than Social Security benefits of approximately $2000 per

4

month.  These are grossly insufficient to fund even their living expenses in this administrative period, which the Debtors quantify at $32,519 per month.  This sum includes approximately $14,000 per month in mortgage and real estate tax obligations that continue to accrue and to consume whatever equity (if any) the estate has in the home; accruing unpaid water and sewer charges are further eroding this equity.  Sale of the home would stem this hemorrhaging, and the Debtors appear to be committed to selling it, but they have been slow to commence the process, and no sale is imminent.  Upon sale of the house, the Debtors will require alternate housing, which they presently have no means to fund.  They have made no mention of their plans in this regard; they have not indicated the expected cost of replacement housing.  The house and living expenses are major drains on the estate.

     Nor can the Debtors fund the attorney's fees and other administrative costs that are accruing in the case and the much greater attorneys' fees that would be necessary to litigate the two or three proceedings that the Debtors must prosecute and successfully resolve before they can hope to confirm a plan; the Debtors are therefore digging the estate into deepening administrative insolvency. The Debtors contend that this will change when they recover a prepetition receivable from Shaklee (approximately $180,000 as of the petition date) and restore their regular stream of Shaklee income going forward.  They overlook that, according to their own schedules, the Shaklee receivables and distributorship are encumbered by judicial liens; to use the proceeds of these assets, the Debtors would need authority to use cash collateral but have not explained how this will be obtained or even appear to recognize the need to address this issue.  They have not explained how they would supply the adequate protection that would be necessary to obtain authority to use cash collateral.  In addition, recovery of the Shaklee receivable and restoration of cash flow from the Shaklee distributorships appears to be anything but quick, simple, and certain:  first, ownership of the larger of the two distributorships is in substantial dispute, resolution of that dispute will not likely be quick, and the outcome is far from certain; second, if Jack Cranney succeeds in establishing the disputed distributorship as his own, he will

be in violation of Shaklee rules prohibiting a single individual from sponsoring more than one distributorship, and this in turn would likely lead to a downward recalculation of amounts that were owed and paid to him in the past and would depress his anticipated future earnings (if any) from the distributorships; and third but not least, Shaklee may terminate a distributorship, and if, as appears likely, Jack Cranney is shown to have defrauded others, including mostly (if not exclusively) other Shaklee distributors, in the alleged Ponzi scheme, Shaklee would likely terminate one or both of the distributorships rather than leave them in Jack Cranney's control. In short, administrative expenses in chapter 11 would be substantial, and there is no evident means of funding them. For these reasons, the UST has convincingly demonstrated a substantial or continuing loss to or diminution of the bankruptcy estate.

The UST has also shown by a preponderance of the evidence "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). I am mindful that at this early stage of the case, a debtor should not be expected to present a mature and fully-detailed plan. Nonetheless, the debtors may be expected to show some sober and realistic prospect for confirming a plan.

Here, the nature of the contemplated plan is clear enough. The Debtors would retain their nonexempt assets, operate the two Shaklee distributorships, and, from the income they generate, pay their considerable living expenses and, with whatever is left over, pay their creditors a dividend over time. They contend that this dividend to creditors from Jack Cranney's continued operation of the distributorships would be more valuable to creditors than the dividend creditors could expect in a liquidation under chapter 7, but they quantify neither the proposed dividend nor the likely recovery in chapter 7. Beyond this rough outline, the Debtors have offered virtually no other details—plan duration, provisions for secured and administrative creditors, projected distributorship income and expenses, historical records on which to base projections, the specific treatment of unsecured creditors (even within a range)—and little to establish any likelihood of this plan's being confirmed. The only

6

certain feature of their plan is that it would allow them to retain whatever interest they have in the distributorships and to use the income from the same to fund their living expenses.  The UST, on the other hand, has amply demonstrated that confirmation of a Debtor-proposed plan is most unlikely.

First, although Jack Cranney vehemently denies that his receipt of over $10.4 million in loans to two wholly-owned entities was a Ponzi scheme, the evidence strongly suggests it was.  When asked to explain his use of the funds, he said he could not because the IRS had seized his records.  This is not credible.  Notwithstanding the seizure of his records, he should be able to recall his business plan in entering into these loan agreements and, at least in a general way, the purposes and uses to which he actually put the money and, when he received the loans, intended to put the money.  Later, he testified that he used some of the money to fund payments on some of the loans and that he transferred some of the money to an account used to fund his and Nevena's living expenses; both uses are consistent with a Ponzi scheme.  He could articulate no business plan pursuant to which he received or used these monies.  He could not explain how the money was used in or necessary for operation of the Shaklee distributorships.  In other testimony he testified that the two distributorships could together be operated on expenses of between $2,000 and $3,000 per month, numbers wholly incommensurate with the $10,400,000 received as loans.  Likewise, the historical *gross* earnings from the distributorships (that is, *before* subtraction of business expenses, income taxes, and the Cranneys' living expenses) would, even at their height, be insufficient to permit servicing of the promised interest on $10.4 million (rates on the loans varied, with evidence of rates of 12, 8, and 5 percent per annum), much less repayment of principal.  His lenders were mostly people who knew him through Shaklee, respected him for his success and golden touch as a Shaklee distributor and trainer, and trusted him.  He says he was not in the business of borrowing money, but $10,400,000 in loans from approximately 36 individuals suggests otherwise—he had a purpose in obtaining these loans.  Though the purpose of these findings is not to make a final determination on the allegations against Jack Cranney, the allegations are pointedly

relevant to this bankruptcy case, to the present motion to convert, and to the wisdom of leaving the Debtors in possession of the estate; and it is hard on the present record to anticipate any other outcome than that the allegations of a Ponzi scheme will stick. It follows that the continuation of Shaklee distributorships in the name or under the control of Jack Cranney is in substantial doubt, as are the feasibility and likelihood of confirming any plan dependent on his operation of Shaklee distributorships.

Second, it appears doubtful that the income Jack Cranney could generate from the distributorships would exceed the total of the Debtors' living expenses and the expenses Jack Cranney would incur to generate the income. On their schedule of income and expenses, the Debtors state that their net income from these distributorships is just $20,000 per month.[1] Even with a substantial reduction in housing expenses from sale of their home, this sum is barely enough to cover living and business expenses. Jack Cranney testified that living expenses would be $6,000 above medical costs; the Debtors' schedule of expenses show medical costs at $10,514 per month (Nevena requires round-the-clock care). And he estimated business expenses at $3,000 per month. The margin of profitability is slim at best and certainly insufficient, even over 60 months, to pay secured and administrative claims in full and then a dividend of even pennies on the dollar to unsecured creditors. Jack Cranney testified that he would work to increase the income, but on the whole he supplied no reason for optimism in that regard; the distributorships earnings have been decreasing steadily for a decade. In short, the proposed plan would do little more than arrogate to the Debtors the value of assets that in chapter 7 would go to creditors (if they belong to the estate at all and can be assumed and assigned).

---

[1] There is evidence elsewhere in the record (at Exhibit 46) that gross distributions from the two receiverships totaled $523,000 in 2012, or $43,583 per month, but these are gross figures and do not reflect the expenses of earning these distributions, as to which the Debtors have supplied no evidence. Also, 59% of the gross income is received in the first instance by Belmont Industries, a corporation wholly owned by Jack Cranney, and nowhere has Jack indicated the amount of his net income from Belmont Industries. In their Statement of Financial Affairs, the Debtors have indicated that their total income from their Shaklee Distributorship *and* Belmont Industries in the 12 months immediately preceding their bankruptcy filing was $816,026.35, which is inconsistent with Exhibit 46. The Debtors have made no attempt to reconcile these various income figures. All are the Debtors' numbers, and of these I find the $20,000 figure to be the most reliable as a measure of net income from the distributorships.

Third, the Debtors show no recognition of having to address secured debt and administrative expenses in a plan. According to the Debtors' amended schedule of secured creditors, at least two of the lenders affected by the alleged Ponzi scheme have liens totaling $380,000 in value on the Debtors' own Shaklee distributorship. Administrative claims, especially attorneys' fees, will also be substantial.

Fourth, as indicated above, confirmation would require that the Debtors prevail (i) in litigation with David and Mandy Cranney over control of the more lucrative of the two distributorships in which they assert an interest and (ii) in litigation with Shaklee over restoring their presently suspended distributorships and the flow of income these have historically provided to the Debtors. The latter action may in turn require determination of the SOC's administrative complaint, or at least of the merits of the allegations on which it is founded. This litigation poses a serious substantive impediment to confirmation of the Debtors' proposed plan; were the Debtors to lose in any one of these actions, their plan could not be confirmed. Also, the time and attorney's fees that will be required to resolve this litigation are themselves serious challenges to their plan confirmation efforts.

Fifth and not least, where a creditor faces credible allegations of fraud, especially of the kind and scale presented here, his ability to negotiate, "sell," and confirm an otherwise meritorious plan is, as a matter of fact if not of law, compromised. Few will credit the plan as having been proposed in good faith. His credibility as to earning potential and as to the extent and value of his assets is in substantial doubt. Some $10.4 million in loaned moneys remains mostly unaccounted for.

For these reasons, the UST has established the absence of a reasonable likelihood of rehabilitation, and, on the record before me, such as it is, that there is cause to convert the case to Chapter 7. Still, some of the loan creditors insist that the Shaklee distributorships can and would generate a greater recovery for creditors through a plan of the type that the Debtors propose than through a liquidation of the distributorship interests in chapter 7, and it is not clear that a conversion to chapter 7 is in the best interest of creditors. I have found strong reasons to doubt the confirmability of

any plan based on the operation by Jack Cranney of the Shaklee distributorships, especially if proposed by the Debtors alone and not also a separate estate fiduciary, but I also have no evidence of the value for which the distributorships might be liquidated in chapter 7 (if a trustee could liquidate them at all). The evidence and relevant considerations on a host of relevant issues are grossly incomplete, and I have no confidence in the Debtors' numbers or that they have presented the strongest case for a plan. Though I am skeptical, and the evidence preponderates in favor of conversion, it is not clear that a brokered plan of some kind cannot be negotiated and confirmed.

Where cause for conversion is established but the court determines that the appointment under 11 U.S.C. § 1104(a) of a trustee is in the best interests of creditors and the estate, the court may, instead of converting the case, appoint a trustee.  11 U.S.C. § 1112(b)(1).  I find that the appointment of a chapter 11 trustee is in the best interest of the estate and amply justified under 11 U.S.C. § 1104(a)(1) and (2) (requiring appointment of a trustee for cause, including fraud, dishonesty, or gross mismanagement or where such appointment is in the interests of creditors and the estate).  It is in the best interest of creditors and the estate at this juncture to appoint a chapter 11 trustee to conduct an independent review and report to the court on the prospects of confirming a plan and the adviseability of the case's remaining in chapter 11.  Thereafter, the Court will make a final determination on conversion.

**ORDER**

Pursuant to 11 U.S.C. §§ 1112(b)(1) and 1104(a), the Court hereby ORDERS the United States Trustee to appoint a chapter 11 trustee in this case and directs the trustee so appointed to file a report on or before July 8, 2013 on the prospects of confirming a plan in this case and the advisability of the case's remaining in chapter 11. Upon receipt of the report, the Court will make a final decision on the issue of conversion.

Date: May 30, 2013

_____
Frank J. Bailey
United States Bankruptcy Judge